# J. W. KENT v. FRED FREEMAN and TILLMAN B. HARRISON.

# MRS. ALMA HUDSON v. FRED FREEMAN and TILLMAN B. HARRISON. —345 S. W. (2d) 252.

Middle Section. October 28, 1960.

Certiorari Denied by Supreme Court March 10, 1961.

Claude Callicott, Burt Francis, Nashville, for plaintiff.

W. T. Goodall, Jr., Gallatin, for defendant.

I

SHRIVER, J. This is an appeal in the nature of a writ of error in two cases tried together wherein J. W. Kent and Alma Hudson, were plaintiffs below. There was a jury verdict in favor of the defendants in the case of J. W. Kent, and in favor of the plaintiff in the case of Alma Hudson fixing her damages at $1,000.

From the foregoing verdict and judgment both plaintiffs have appealed and have assigned errors.

## II

### Assignments of Error

The first four assignments of error turn on the question whether or not there is evidence to sustain the verdict of the jury in each of the two cases. Assignment No. 5 complains of error on the part of the Court in consolidating the two cases over the vigorous objections of both plaintiffs.

## III

Plaintiff J. W. Kent, a man 67 years of age and a resident of Wilson County, Tennessee, was driving his automobile, accompanied by several members of his family and Mrs. Alma Hudson. They were proceeding in a westwardly direction along the Red River Road in Sumner County a short distance West of Gallatin, Tennessee, on their way to visit a son of J. W. Kent, who resides on Douglas Lane some three or four miles northwest of Gallatin, Tennessee.

As the Kent vehicle came to a stop, or almost to a stop, to turn right into Douglas Lane it was run into from the rear by a truck owned by the defendant Fred Freeman and being driven by his employee Tillman B. Harrison, with resulting damages to the Kent automobile and to the plaintiffs.

There is virtually no dispute in the evidence with respect to how the accident occurred, the only matter in dispute being as to whether or not Mr. Kent gave a signal of his intention to turn right into Douglas Lane, and, as will be seen hereinafter, we are of opinion that this dispute is immaterial in view of the testimony of the defendant driver.

Plaintiff, J. W. Kent, testified that he had passed the defendant's truck a mile or two back from the scene of the accident and that he did not know how far this truck was behind him at the time he approached Douglas Lane, however, when he reached a culvert across the road, which was some fifty or seventy-five yards before reaching the intersection of Douglas Lane, he commenced giving a signal indicating a right turn which he did by means of a mechanical signal or blinker-light and that these lights were in working order; that when he turned the indicator on the small light on his dashboard flashed on and off and it made a clicking sound which indicated that the signal lights were working. He did not hear any sound of a car approaching him from the rear, no brakes squeaking or tires skidding. Just inside Douglas Lane a Telephone Company truck was parked so he slowed down to be sure that he had room to pass this truck and just as he was making his turn the defendant's truck bore down upon him and struck his car in the rear.

In this connection he testified that his 1950 Mercury automobile was worth $800 before the accident and that he had it examined by capable mechanics after the accident and that he found it inadvisable to try to have it repaired; that it was worth nothing except for junk. He thought he might get from $75 to $100 for it as junk.

Mrs. Alma Hudson was a passenger in the Kent car, sitting on the back seat directly behind the driver. She testified that when Mr. Kent was some 75 yards east of the intersection of Douglas Lane he gave a blinker signal of his intention to make a right turn, and that she heard the clicking customarily made by such signal, and also saw the light on the dashboard which indicated that the signal was being given; that just as the Kent vehicle was turn-

ing into the intersection it was struck with great force from the rear by the defendant's truck so that she was thrown from the back seat over the driver's seat into the front part of the automobile and seriously and permanently injured.

J. W. Kent, II, who was a passenger in the Kent car testified that he is a grandson of the plaintiff, and that some thirty or forty minutes after the accident they checked the signal lights on plaintiff's car. The left rear light had been torn off by the collision but the right one was still burning and was visible.

James G. Kent testified that he is a son of the plaintiff who lives on Douglas Lane in Sumner County; that soon after the accident he received notice of it and went to the scene; that there were absolutely no skid marks on the highway at or near the scene of the accident; that his father's car was greatly damaged; that the right signal light was checked at the scene of the accident, and that it burned in a normal manner even after the accident, although the left light was destroyed by the collision.

Mrs. J. W. Kent corroborated the testimony of her husband as to how the accident occurred and as to his turning on the blinker signals.

Mr. John Pollock, a State Trooper, investigated the accident. He stated that there were no skid marks on the road. He checked the right rear signal light on the Kent vehicle after the accident and said that it was burning but was very dim; that the left rear light of the Kent vehicle was smashed and he did not know what damage was done to the lighting system of the Kent vehicle by the collision. He further testified that defendant's truck was heavily loaded with asphalt.

Reese Duncan testified that he went to the scene of the accident about five minutes after it occurred and that the Kent vehicle was torn up pretty badly, as shown by photographs introduced in the record; that the truck made no skid marks on the highway; that the rear signal light on the right of the Kent vehicle was tested and was still burning.

Linda Smith, a granddaughter of J. W. Kent, corroborated the other witnesses with respect to the turning on of the blinker signal and as to the other facts stated by them with respect to the accident, as did Rosie Lee Smith, who was also a passenger in the car.

The defendant, Tillman B. Harrison, was driving the one and one half or two ton truck loaded with seven and one half tons of asphalt at the time of the accident. He stated that he was driving about 30 to 35 miles an hour and said:

"Just as I started over the hill, started dropping down, I saw this car. Which was approaching the bridge, that is when I saw them, when I came up to the bridge, there was the car setting on the road."

He testified that Mr. Kent did not give a signal with his arm and he did not see a blinker signal indicating a turn.

On cross examination when asked when was the first time he observed the Kent car ahead of him, he answered:

"The first time I seen it was when I dropped over the hill, started down the hill."

He was then asked if that was not about a half mile back from the intersection of Douglas Lane, he stated,

"Not that far. Not $\frac{3}{10}$ths of a mile."

However, he stated that he saw the car as it was approaching the bridge and in answer to a question said that the bridge was about 150 feet from the intersection of Douglas Lane.

He further testified:

"Q. You were right there, some three-tenths of a mile back from Douglas Lane, and he was maybe 150 feet, and you say you just kept bearing down on him there, and all of a sudden you realized that he was standing in front of you? A. I dropped off the hill.

\* \* \* \* \* \*

"Q. Was he stopping the car there? A. Yes, the way I saw it, he stopped the car and looked at the telephone truck, to see if he could turn in there.

"Q. While you were traveling three-tenths of a mile he did not have to go but 150 feet? A. No, he was down there close to the bridge.

\* \* \* \* \* \*

"A. This truck is listed as 1½ or 2 tons.

"Q. You are not saying that a 1½ or 2 ton truck is not mechanically designed and fitted with brakes to carry 7½ tons, you are not asking this jury to believe that? A. No, sir.

"Q. Mr. Kent was just sitting there when you hit him? A. Yes, sir.

"Q. How long had he been sitting there before he started up his car? A. I don't know."

It should be observed that Mr. Kent had lost his left hand and part of his arm many years ago, however, it was testified by him and his witnesses that he did put out this part of his arm that was left on the left side of the car to indicate a right turn, but the defendant driver testified that he saw no signal.

It is not disputed that Mr. Kent had a blinker signal on his car and that he turned this on and observed a clicking sound and a flashing light on his dashboard which was in observance of the normal precaution that an ordinarily prudent man would take under the circumstances, but it is disputed by the defendant that the light in the rear was shining so that he could see it.

As stated hereinabove, we think this is not determinative of the question of contributory negligence on the part of Mr. Kent in view of the testimony of the driver of the truck.

The driver of the truck, by his own admission, saw this car which was plainly visible, the accident occuring in day-light, and he saw it when he was admittedly some $\frac{9}{10}$ths of a mile behind it. He saw it approaching Douglas Lane and saw it slow down, and he said, it stopped as it was about to turn in Douglas Lane. He then stated that, just as it made its turn into Douglas Lane, he ran into it from the rear. There was no claim on his part of a sudden and unnecessary or unexpected stop by plaintiff Kent.

Defendant was driving a 1½ or 2 ton truck loaded with 7½ tons of asphalt which, admittedly, it was not properly equipped with brakes to safely handle.

Since the defendant saw this car all the time, saw it slowing down, saw it stop in front of him when defendant

was 150 feet from the stopped car the giving of a turn signal or the failure to give a turn signal, would not have changed the situation in the slightest and, therefore, as a matter of law, could not be regarded as the proximate cause, or a proximate contributing cause of the accident.

Especial attention is called to defendant's statement hereinabove quoted where he said; "* * * *When I came up to the bridge, there was the car setting on the road.*"

The bridge is shown to be approximately 150 feet from the point of collision.

If there is any evidence from which the jury could have found that J. W. Kent failed to do all that ordinary care required of him with respect to giving a turn signal, it could only be regarded, at most, as remote contributory negligence, hence, could not be considered as barring his recovery altogether but would only mitigate his proven damages.

As stated by learned counsel for the plaintiff in their well prepared brief, where the driver of a trailing vehicle sees that the leading vehicle has stopped and, thus, has the information which a lawful signal would convey to him, the failure of the driver of the leading vehicle to give a signal before stopping is not the proximate cause of an accident which occurs when the trailing vehicle runs into the rear end of the front vehicle. Some of the authorities hold that, under such circumstances, the statutory duty to give such signal is not applicable, while other authorities hold that the failure to give such signal may still be a technical violation but cannot be a proximate cause of the accident.

There are numerous authorities to this effect, including Harris v. Hendrixson, 25 Tenn. App. 221, 155 S. W. (2d) 876, 877, and many cases in other jurisdictions as set out in the annotation entitled, "Sudden or unsignalled stop or slowing of motor vehicle as negligence". 29 A. L. R. (2d) sec. 9 at page 44.

In Harris v. Hendrixson, supra, there was a judgment below for the plaintiff who ran into defendant's car from the rear. In that case the plaintiff saw defendant's car approximately 567 feet in front of him, proceeding in the same direction. Defendant's car was, as was the Kent vehicle in this case, not going fast. Nevertheless, the plaintiff continued on, and finally drove into the rear of defendant's car, which, according to the defendant, was still moving, but, according to plaintiff, had stopped. Admittedly, the defendant gave no signal. The Court of Appeals reversed and dismissed the suit, holding that the proximate cause of the accident was not the failure of the defendant to give a signal. The Court said:

"What was the proximate cause of this accident?

"The plaintiff says it was the failure of the defendant to give the signal as required by sub-section (d) 6 of section 2682 of the Code, 1938, which provides that a signal shall be given continuously for a distance of 50 feet before slowing down, stopping, or materially altering the course of his vehicle. * * * Under the undisputed facts of this case we think the proximate cause of this accident was the failure of the plaintiff, driving a one-seated car, with three other people, two of them girls, on the seat with him, at a speed of 40 miles per hour, in not slowing up or turning to the left in order to pass the defend-

ant's car, which he, the plaintiff, says was going slowly on the right side of the road, with nothing whatever to keep him from passing, except his own speed. He says he didn't think he had time to pull around the defendant's car, when he admits he saw it from a point 567 feet away. The failure to signal on the part of the defendant was not the proximate cause of the accident.''

In Swedman v. Standard Oil Company, 12 La. App. 359, 125 So. 481, the Court discussed a case in which the defendant insisted that the failure of the driver of plaintiff's car to give a signal of his intention to stop, as required by statute, was one of the proximate causes of the collision. The Court of Appeals concluded that the evidence showed that the plaintiff's car had been stopped for an appreciable time prior to the observation made by the driver of the truck, and that the admitted failure of the front driver to give a signal did not proximately contribute to the collision.

In Ryan v. Trenkle, 203 Iowa 443, 212 N. W. 888, 890, the Court, in discussing a similar question to the one involved here, stated that it is elementary that negligence may not be predicated on the failure to give signals when such failure in no-wise can be said to be the proximate cause of the injury. Further stating, ''A person who has knowledge of the presence of a train or auto which imparts to him the very thing that a signal was intended to impart cannot, under ordinary circumstances, predicate negligence on the failure to give a signal.''

In Ivey v. Hanson, 226 Mo. App. 38, 41 S. W. (2d) 840, 841, 842, in discussing the necessity for signals, the Court said:

"Nearly all of these instructions emphasize the failure of the driver of the truck to give any signal of his intention to back. Appellants contend that it was error to instruct in this case that it was negligence not to give a signal, for the reason that the purpose of the signal is to give a party notice of what is about to be done, and since plaintiff testified that he saw the truck all the time, from the time and before the driver began to back it, and saw it all the time it was being backed, that signals could not have given plaintiff any knowledge other than that which he already had, and for that reason it was not actionable negligence not to give the warning."

To the like effect is Fuld v. Maryland Casualty Company, La. App., 178 So. 201, and Snowden v. Skipper, 230 Miss. 684, 93 So. (2d) 834, 837, wherein the Court stated as follows:

"The appellants also assign as error that the trial court erred in submitting to the jury the issue of the alleged negligence of Snowden in stopping his taxicab on the highway without giving any warning by the use of hand signals, arm signals, blinker lights or other type signal. We think this contention is well founded under the facts of this case, and that the court's submission of this issue to the jury constitutes reversible error. Boardman testified, and he is not contradicted, that when he first saw the cab it had already stopped and the headlights and taillights on it were burning. It was, therefore, immaterial under the facts of this case whether Snowden before stopping gave any signals or not, and Sections 8192 and 8193 of the Mississippi Code of 1942 with reference to giving signals do not apply."

To the same effect is Curtiss v. Fahle, 157 Kan. 226, 139 P. (2d) 827, and Wohlenberg v. Malcewicz, 56 Cal. App. (2d) 508, 133 P. (2d) 12, and numerous other cases.

There is no contention whatsoever that there was any negligence on the part of Mr. Kent except his alleged failure to give a signal of his intention to turn right into Douglas Lane. The evidence is without dispute that he did turn on his blinker signal. The only point of dispute is as to whether or not this blinker signal worked so as to be visible to the driver of the truck.

As we have seen hereinabove, defendant Harrison saw this car in front of him all the way from the time he came over a small hill some ³⁄₁₀ths of a mile away and continued to have it in plain view all the time, hence, it would appear that the sole proximate cause of this accident was the negligence of the driver of the truck in failing to keep his vehicle under proper control, and the negligence of the driver and owner thereof in operating an overloaded truck which could not be stopped in the space and time that prudence required.

As to Mrs. Alma Hudson there is no contention anywhere in the record, nor any showing, that she was guilty of the slightest contributory negligence, hence, the question of the adequacy or inadequacy of a judgment for $1,000 in view of her injuries is to be considered.

## IV

As has been seen hereinabove, Mr. Kent had an automobile that he testified was worth about $800 before the accident and which was damaged so as to be virtually without value except for junk, yet the jury found a verdict against Mr. Kent allowing him nothing.

As to his personal injuries, there is much dispute and it may be that the jury believed that he was not so injured as to be entitled to damages therefor, but there is no dispute as to his property damage and, unless he was barred by proximate contributory negligence, there should have been a recovery in some amount in his favor.

As to Mrs. Alma Hudson, she was taken to the Community Hospital in Gallatin, Tennessee, after the accident, where she was treated by Dr. Robert A. Moore. She was put in traction which consisted of lying on a board and having sandbags attached to her legs and to her neck. The sandbags attached to her legs weighed ten pounds and those attached to her neck weighed twenty-five pounds, and it was testified that she suffered much pain as the result of this treatment. She was also given certain heat wave treatments, and was in the hospital eleven days. Then, when released she was sent to Dr. John R. Glover in Nashville where she received additional diagnosis and treatment. She also went to St. Thomas, Vanderbilt, and Mid-State Baptist Hospitals where she received some treatments for which she was not charged, since she is a licensed practical nurse, however, her doctors and hospital bills amounted to $421.10 and she was disabled from work for some time. It was not shown that she was employed at the time of the accident, but it was shown that her earning capacity was about $50 a week as a practical nurse.

Dr. Moore testified as to the treatments given her and as to the condition resulting from the accident causing injury to her neck and spine. He stated that it took a good deal of time for such injuries to heal and he sent her to Dr. Glover in Nashville. Dr. Glover testified as

to his examination and treatment of this patient from his records and from X-ray pictures. He stated that she had continued to have pain in her head, neck and back from the time of the accident until she was seen by him, and he testified that, from the X-rays, he found she had a tear of the ligaments which hold the bones in their normal position in her neck, that a vertebra was displaced backwards and the ligaments so torn that it slides backwards instead of just arching when the neck is bent. He stated:

"In my opinion this being present some six months after the accident it is a permanent thing. Ligaments are what are spoken of as soft tissue and we feel that the healing which will take place in this particular regard will do so within two months or so after the accident."

He also testified further:

"In my opinion, the permanent effect of this will be irritation with continuous scar tissue and adhesion formation at this level around the nerve which comes out of the spinal cord at this particular level. This will make for constant irritation of the nerve and pain in the part of the arm to which this nerve normally supplies the feeling and the motion. This will be demonstrated, or be present especially when the neck is turned a lot or a strain is placed on the neck by more than moderate use of the arms. She will be expected to have more than the usual discomfort with changes of the weather and especially after long automobile trips."

He further testified that his diagnosis was an acute injury to the muscles and ligaments of the neck with

irritation of the nerves, and the second diagnosis, acute traumatic aggravation of preeixsting arthritis of the spine.

He finally said that he felt that the permanent disability of this lady as the result of the automobile accident will be that of pain in her neck, shoulders, and arms following any type of activity which places more than a moderate amount of stress and strain on the muscles and ligaments of the neck. This includes activities whereby the arms are used in an extended position like lifting something with the arms straight, bending, stooping, or things that will place a stress on the neck by the muscles which brace the shoulders running from the neck to the shoulders and, therefore, aiding the arms.

Since this lady is a practical nurse by profession, of course the above described limitations will affect her future earning capacity and ability to perform her duties as a nurse.

As was said in Board of Mayor and Aldermen of Covington v. Moore, 33 Tenn. App. 561, 232 S. W. (2d) 410, where the complaint relates to the question of liability or no liability, the appellate courts will not weigh the evidence but where the complaint relates to the amount of the verdict either for excessiveness or inadequacy, appellate courts will weigh the evidence, not merely to determine the bare preponderance, but to determine whether the evidence so greatly preponderates against the amount found as to show passion, prejudice or unaccountable caprice.

And again in Flexer v. Crawley, 37 Tenn. App. 639, 269 S. W. (2d) 598, it was said that while the matter of damages is primarily for the jury to determine, and

will not ordinarily be overturned where it is approved by the trial Judge, yet that general statement is subject to the limitation that where the verdict is so grossly inadequate in comparison with the injuries actually sustained as to evince passion, prejudice or unaccountable caprice on the part of the jury, the appellate Courts will look into the facts and set the verdict aside.

In instances where there was material evidence from which the jury could have found the plaintiff guilty of remote contributory negligence the courts are more reluctant to disturb a verdict of the jury as is seen in Meeks v. Yancey, 43 Tenn. App. 667, 311 S. W. (2d) 329 and Smith v. Steele, 44 Tenn. App. 238, 313 S. W. (2d) 495.

In this lady's case there is no contention that she was guilty of any negligence either proximate or remote.

We are convinced that justice has not been reached in these cases and that the verdict of the jury indicates mistake, accident, prejudice or caprice so that the verdict should be set aside and the causes remanded for a new trial.

We think the question of consolidation for trial is one that is so largely in the discretion of the trial Judge that we should not reverse on the assignment that the trial Judge erred or abused his discretion in this regard.

The judgments are reversed and the causes remanded for a new trial or trials, as may be determined by the trial Judge.

Reversed and remanded.

Hickerson and Humphreys, JJ., concur.